IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 13-252 |
| | ) | |
| RHIONNA RHODES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

CONTI, Chief District Judge

On October 15, 2013, defendant Rhionna Rhodes ("defendant") filed a motion to review detention order pursuant to 18 U.S.C. § 3145(b). (ECF No. 148.) After a de novo review of the proceedings before the magistrate judge, as well as a review of the pleadings in this case, the pretrial services report prepared by the pretrial services officer, the arguments of counsel, and the hearing held on October 24, 2013, this court denied defendant's motion and ordered that defendant be detained without bond pending trial. This Memorandum Opinion sets forth the reasons for the court's decision, which were detailed on the record.

**I.  Background**

    **A.  Procedural History**

On September 25, 2013, a grand jury returned a one-count indictment at criminal action number 13-252 charging defendant, Luis Carde ("Carde"), and nine others with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine, and one kilogram or more of heroin, from January 2011 to September 2013. (ECF No. 60.) The offense at count one of the indictment carries a statutory

minimum term of imprisonment of not less than ten years and a statutory maximum term of imprisonment of life. (ECF No. 61 at 2-3.) For a second felony drug conviction, if an information is filed pursuant to 21 U.S.C. § 851, the statutory minimum term of imprisonment is twenty years to a maximum of life. (Id.) For a third felony drug conviction, if an information is filed pursuant to 21 U.S.C. § 851, the statutory minimum term of imprisonment is life. (Id. at 3.)

A detention hearing was held on October 7, 2013. At the hearing, the magistrate judge determined by clear and convincing evidence that defendant posed a risk of danger to the community and entered an order of detention for defendant pending trial. (ECF No. 160 at 70.) After defendant moved to revoke the order of detention, this court held a de novo hearing on October 24, 2013. After reviewing the transcript of the October 7, 2013 detention hearing, and taking into consideration the evidence and proffers of evidence presented at the October 24, 2013 hearing, the court denied defendant's request for bond.

### B. Offense History

At the detention hearing before the magistrate judge on October 7, 2013, the government presented the testimony of Jason Binder ("Binder"), a detective with the Allegheny County Police Department involved in the investigation of the alleged drug trafficking activities of defendant, Carde,[1] and their co-defendants. (H.T. 10/7/13 (ECF No. 160) at 7.) The conspiracy charged in this case is referred to as the "Carde drug trafficking organization." (Id.) Binder testified:

- Seven kilograms of cocaine, seven pounds of methamphetamine, and more than 1.2 million dollars were recovered as a result of the investigation. (Id. at 7-8.)

- Vehicles were also seized as part of the investigation. (Id. at 10.) An Acura vehicle was seized that belonged to or was at defendant's residence. (Id.) There was a trap compartment in the Acura, and a loaded magazine for a firearm was found inside the trap

---

[1] According to Binder, Carde is also known as "Weezy." (H.T. 10/7/13 (ECF No. 160) at 28.)

compartment. (Id.) A trap compartment must be added to a vehicle and is often a hydraulic compartment, double locked, and concealed within a vehicle. (Id.)

- The investigation involved wiretap communications. (Id. at 7.)

- Carde received his drug supply through Angel Rodriguez ("Rodriguez"), also known as "TO," who obtained the supply from Edred Melendez ("Melendez"), also known as "Flaco." (Id. at 8.)

- Carde received heroin in an unbagged form known as "raw heroin." (H.T. 10/7/13 (ECF No. 160) at 7.)

- Defendant oversaw the bagging of the heroin as part of the Carde drug trafficking organization. (Id. at 9.) A confidential informant charged in this case informed law enforcement that he or she participated in bagging heroin and confirmed that defendant oversaw the bagging process. (Id.)

- Law enforcement learned via the wiretap communications that Carde was out of town in June 2013. (Id. at 10-11.) One of the telephones subject to the wiretap was an anonymous telephone. (Id. at 11.) Carde left the anonymous telephone with defendant when he was out of town. (Id.) In late June 2013, defendant was intercepted communicating with various individuals via the anonymous telephone, including one of Carde's cocaine customers. (Id.) Defendant spoke with Carde's cocaine customer about the logistics of supplying the customer with cocaine. (Id.)

- In July 2013, Carde was arrested by the Pittsburgh Police for attempted homicide based upon an altercation at a night club. (Id. at 12.) Carde was charged with stabbing and disemboweling the victim. (Id.) Carde has been in jail at the Allegheny County Jail on those charges since July 2013. (Id.)

- A review of Carde's communications from the Allegheny County Jail revealed defendant was meeting with Carde at the Allegheny County Jail and Carde sent letters to defendant from jail. (Id.) During a search conducted of defendant's home incident to her arrest, law enforcement retrieved letters Carde sent to defendant from the Allegheny County Jail. (Id. at 12-13.)

- The review of Carde's communications from the Allegheny County Jail and the letters Carde sent to defendant "indicated that [defendant] was the most trusted member of the Carde organization and that he wanted her to handle the drug end of the business for him while he was incarcerated." (Id. at 13.)

The government entered four letters into evidence to show defendant was the most trusted member of the Carde organization. Exhibit 1 is a letter from Carde to Jason Beggarly, an

3

alleged member of the Carde drug trafficking organization and co-defendant in this case. The pertinent part of Exhibit 1 provides:

> I'm having Ree call u n get w u so u can give her homies # they stopped by n gave u. So <u>she</u> can get in touch w them n relate 2 me everything they <u>say</u>! All I need u is 2 verify that that's who I want 2 deal with <u>them</u>! I don't want <u>NO</u> <u>ONE</u> else <u>talking</u> or <u>doing</u> <u>anything</u> <u>w</u> them <u>but</u> <u>her</u>!...I only want her talking with Papo or Flaco.

Binder testified this passage "indicates that Jason Beggarly was attempting to communicate with Flaco and Papo in order to obtain cocaine and possibly other drugs and Carde did not want it to go that way, that he wanted [defendant] to deal with Papo and Flaco." (H.T. 10/7/13 (ECF No. 160) at 14.)

Exhibit 2 is a letter from Carde to defendant found in defendant's home during the search that occurred incident to her arrest. The pertinent part of Exhibit 2 provides:

> I talked 2 Jason 2 day ima need 2 c u against on Wed. I guess my homies stopped by and left a number or something and told him that u all could stop by after u guys hollered at me. I want u on that ASAP! Only u though when u talk 2 them! Ima write Jay n explain to give u da number so u call n meet them where ever and then u can come back n c me and let me know what they said so I can think and c what I wanna do O.K.

Binder testified that this portion of the letter indicates "Carde did not want Jason handling the drug business. He wanted [defendant] to facilitate obtaining additional cocaine and other drugs from Papo and Flaco." (H.T. 10/7/13 (ECF No. 160) at 15.)

Binder testified that a letter written in Spanish from Carde to Melendez was recovered from defendant's home during the search conducted incident to her arrest. (H.T. 10/7/13 (ECF No. 160) at 16.) Exhibit 3 consists of two pages with respect to that letter. The first page of

Exhibit 3 is the letter translated from Spanish in English.[2] The second page of Exhibit 3 is the same letter written in Spanish. The pertinent excerpts of Exhibit 3 are as follows:

> I want you guys to deal with the girl that I am sending with him....I trust in the Red head and no one else....The red head has 3 of my cars that have traps....First of all I need "Corojo" and the other stuff as well, the "white girl" but please through the red head and not JASON! She will come and visit me tomorrow [8/28/13] and you guys will be receiving this letter by Friday.

Binder testified that currently defendant's hair is red and was red during the summer of 2013. (H.T. 10/7/13 (ECF No. 160) at 16-17.) Binder offered the following explanation with respect to Exhibit 3:

> Carde is indicating that he wants Papo and Flaco to deal with [defendant] and no one else and that she would be capable of dealing with them due to also possessing three vehicles with traps in them and that she would be the go-between, between visiting the jail and meeting with Papo or Flaco, to conduct business.

(H.T. 10/7/13 (ECF No. 160) at 16-17.) Binder explained the investigation revealed that the members of the alleged conspiracy used "corojo" to refer to heroin and "white girl" to refer to cocaine. (Id. at 17.)

> Exhibit 4 is a letter from Carde to defendant. The pertinent part of Exhibit 4 provides:
>
> U all need 2 step it upit. If u have 2 pay someone 2 sit outside and wait till he gets home take him 2 a hotel and personally take him 2 da lawyers in da AM.
> …
> Here is what I wrote that Fred should get and rewrite to have dude sign an agree 2 it for that 20

Binder testified that in Exhibit 4, Carde "is trying to facilitate through Rhionna Rhodes to pay $20,000 to the victim of the criminal homicide not to testify." (H.T. 10/7/13 (ECF No. 160) at 18.) Binder explained that Carde's lawyer is Fred Rabner, whom Carde referred to in Exhibit 4. (Id.)

---

[2] Binder testified that paid Spanish interpreters participated in the investigation in this case. (H.T. 10/7/13 (ECF No. 160) at 16.)

C.  **Defendant's Personal Background**[3]

According to the pretrial services report prepared by the United States Probation and Pretrial Services Office, defendant reported that she is a lifelong resident of the Western District of Pennsylvania and currently lives in Braddock, Pennsylvania, with her three minor children. (Pretrial Services Report at 5.) Defendant's mother lives in Wilkinsburg, Pennsylvania, and defendant maintains daily contact with her. (Id. at 1.) The Pretrial Services Office reports that defendant has worked for Aramark for twenty years, and works an average of sixty hours per month. (Id. at 2.) Defendant currently works for Aramark at Consol Energy Center in Pittsburgh, Pennsylvania. (Id.) Defendant's monthly income from Aramark is $795, and she receives $435 per month in food stamps. (Id. at 1.) According to the pretrial services report, defendant's monthly expenses for rent and utilities are $488, leaving defendant with an estimated monthly cash flow of $742. (Pretrial Services Report at 2.) Defendant has a history of having anxiety attacks dating back to 1999. (Id. at 3.) Defendant reported she has on average two to three anxiety attacks per week. (Id.) Defendant reported she began recreationally using cannabinoids at the age of twenty-five. (Id. at 4.) Defendant last used cannabinoids on September 30, 2013. (Id.)

On May 20, 1999, defendant was found guilty of involuntary manslaughter at docket number 5377-1998. (Id. at 4.) Defendant was sentenced to "11 months' 29 days' to 23 months '29 days' imprisonment'" for the offense. (Id.) On September 20, 1999, defendant pleaded guilty to intimidation of a witness. (Id.) On April 30, 2009, defendant pleaded guilty to three counts of driving under the influence. (Id. at 5.)

---

[3] Defendant's personal background information was obtained from testimony given by her mother, Sharon Hanner, at the October 7, 2013 hearing in front of the magistrate judge, testimony given by her friend, Patricia Thompson, at the October 23, 2013 hearing, and the pretrial services report dated October 1, 2013.

On October 7, 2013, defendant's mother Sharon Hanner ("Hanner") testified before the magistrate judge. (H.T. 10/7/13 (ECF No. 160) at 45.) Hanner testified that:

- One of defendant's children is disabled because one of her fingers does not grow, and defendant handles all medical needs of the child. (Id. at 46, 48.)

- Defendant is involved with her children. (Id. at 47.) Defendant "takes care of them, does anything they need. [One of the children] is in a dance group and [defendant] takes [the child] back and forth to the dance group. [Defendant] always takes [the child] back and forth to her dance group. [Defendant's son] played football. [Defendant] was very active in the football league." (Id. at 47.)

- Defendant is no longer involved with the father of her three children. (Id. at 48.)

On October 24, 2013, defendant's friend, Patricia Thompson ("Thompson"), whom defendant referred to as "Aunt Trish" testified before this court. Thompson testified that:

- She has known defendant since defendant was five or six years old, and sees defendant at least two times per week and frequently speaks with her on the telephone.

- She would rate defendant a nine or a ten out of ten with respect to defendant's mothering of her children because of defendant's participation in her children's activities and how defendant treats her child who is disabled.

**II.  Standard of Review**

The court's standard of review of a magistrate judge's denial of pretrial detention is de novo. United States v. Delker, 757 F.2d 1390, 1394 (3d Cir. 1985).

**III.  Discussion**

The structured system of the Bail Reform Act, 18 U.S.C. § 3141 et seq., regarding the release or detention of a defendant before trial seeks to ensure that the interests of the defendant and the public are carefully considered and contemplated before release or detention is ordered. The court is charged with holding a hearing to determine whether there exists "any condition or combination of conditions set forth in [18 U.S.C. § 3142(c)] that will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the

7

community." 18 U.S.C. § 3142(f). Section 3142(c)(1)(B) of the Bail Reform Act sets forth a nonexclusive list of conditions that a court may impose upon granting a defendant's motion for pretrial release. If the court determines no sufficient condition or combination of conditions exists, however, the court may order that a defendant be detained without bail pending trial.

During the hearing before this court, the government did not argue that defendant is a flight risk, i.e., defendant will not appear as required; instead, the government argues that no condition or combination of conditions will reasonably assure the *safety of the community*. Safety of the community is implicated not only by violence, but also by narcotics trafficking. In cases involving drug offenses, the danger to the community is the likelihood that the defendant will, if released, traffic in illicit drugs. United States v. Perry, 788 F.2d 100, 111 (3d Cir. 1986).

### A. Rebuttable Presumption

In this case, a rebuttable presumption applies that no conditions or combinations of conditions will reasonably assure the safety of the community. Section 3142(e)(3) provides:

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . (A) ***an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)***

18 U.S.C. § 3142(e)(3) (emphasis added).

There is probable cause to believe defendant committed the offense with which she is charged because a grand jury returned an indictment charging defendant with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine, and one kilogram or more of heroin, from January 2011 to September 2013. (ECF No. 60.) The maximum statutory penalty for this controlled substances offense is life imprisonment. 21 U.S.C. § 841(b)(1)(A). Thus, subject to rebuttal by defendant, it

is "presumed that no condition or combination of conditions will reasonably assure…the safety of the community." 18 U.S.C. § 3142(e). Defendant at the hearings before the magistrate judge and this court did not contest the application of the rebuttable presumption to this case.

A defendant may offer evidence to rebut the presumption that no condition or combination of conditions will reasonably assure the safety of the community if defendant is released pending trial. A defendant must produce only "some evidence" to rebut the presumption set forth in § 3142(e). See United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985). The quantum of evidence required to rebut the presumption is not high; rather, the defendant need only come forward with credible evidence conflicting with the presumption. Id. at 383. When a defendant produces conflicting evidence, the presumption does not disappear. The rebutted presumption retains evidentiary weight. See United States v. Carbone, 793 F.2d 559, 560-61 (3d Cir. 1986) (per curiam); United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991); United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam).

### B. The § 3142(g) factors

In producing evidence to rebut the presumption, a defendant looks to the four factors set forth in § 3142(g) which the court must consider in determining whether pretrial detention is warranted. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (to determine whether the presumption of dangerousness has been rebutted, the court should consider the factors set forth in § 3142(g)). The four factors are:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

### 1. Evidence Presented by Defendant to Rebut the Presumption

Defendant in this case did not offer evidence to address the first, second, or fourth factor listed in § 3142. With respect to the second factor, defendant argued about the weight of the evidence adduced by the government, but did not offer additional information on her behalf; instead, defendant relied upon her history and characteristics to rebut the presumption. Defendant offered the following evidence, which is set forth in more detail supra, to rebut the presumption:

- The pretrial services report recommending defendant be released on bond with certain conditions imposed.

- Hanner's and Thompson's testimony that defendant: (1) is a good mother who takes care of her children and is actively involved in their lives; and (2) has worked for twenty years to support herself and her children; and (3) has strong family ties.

Even assuming the foregoing evidence rebutted the presumption in this case, the government persuaded the court with clear and convincing evidence of the nature of the offense charged, the weight of the evidence against defendant, defendant's personal characteristics, and the nature and

seriousness of the danger to the community posed by defendant's release, that no condition or combination of conditions would reasonably ensure the safety of the community if defendant were to be released. 18 U.S.C. § 3142(f); Perry, 788 F.2d at 115 ("The clear and convincing standard does not even operate until the defendant has come forward with some evidence of lack of dangerousness.").

### 2. Clear and Convincing Evidence Presented by the Government

With respect to the nature and circumstances of the offense charged, the indictment in this case supports the finding of probable cause with respect to this offense and is evidence of the serious nature of the offense, which weighs against a finding that defendant should be released pending trial. Defendant was indicted for conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine, and one kilogram or more of heroin, from January 2011 to September 2013, in violation of 21 U.S.C. § 846. (ECF No. 60.) For the first conviction of such offense, § 846 carries a mandatory minimum term of imprisonment of ten years and a maximum term of imprisonment of life. The government introduced evidence that the alleged conspiracy ran for a lengthy period of time, i.e., January 2011 through September 2013, and more than seven kilograms of cocaine, seven pounds of methamphetamine, and more than 1.2 million dollars were recovered as a result of the government's investigation in this case. This evidence shows the serious nature of the charges filed against defendant in this case.

Second, in considering the weight of the evidence against defendant, the court examined the evidence presented at the hearings, including the evidence outlined above in the background section. Based upon that review, the court concludes that the weight of the evidence against defendant as presented by the government is strong. The government has a confidential

informant that identified defendant as being responsible for overseeing the bagging of heroin for the alleged Carde drug trafficking organization. There is substantial evidence that defendant had a trusted and important role in the conspiracy. The evidence showed:

- Defendant was entrusted with Carde's anonymous cellular telephone when he went out of town. The wiretap on that telephone showed defendant was communicating with one of Carde's cocaine customers about the logistics of supplying the customer with cocaine. Once Carde was incarcerated, defendant maintained contact and communicated with him via visits to the jail and the letters entered into evidence.

- Carde instructed defendant that she was to interface between the suppliers and distributors, and he wrote letters to other members of the conspiracy to inform them that they were to deal with defendant because he trusted her and " <u>no one else</u>."

- Carde in the letters he wrote from jail gave specific instructions about what defendant was to do with Carde's drug business. Regardless whether defendant carried out those instructions, the letters show that Carde trusted defendant and that she was heavily involved with his drug business.

- Defendant possessed at least one and up to three of Carde's vehicles during the conspiracy. The vehicles had trap compartments in them; indeed, a loaded magazine for a firearm was found inside the Acura in defendant's possession at the time of her arrest.[4]

Based upon the foregoing, the weight of the evidence is strong and against a finding that defendant should be released prior to trial.

Along with the evidence of defendant's history and characteristics proffered by defendant, e.g., defendant is a good mother, has strong family ties, and has worked for twenty

---

[4] It is noted that as counsel for defendant argued, there was no direct evidence presented that defendant knew about the trap compartments inside the Acura. In Exhibit 3, which was found in defendant's home, however, Carde wrote that defendant has three of Carde's vehicles with trap compartments in them. As noted above, Exhibit 3 was written in Spanish, and there is no evidence to suggest defendant could read Spanish. In light of the other evidence of defendant's involvement in the alleged Carde drug trafficking organization, e.g., her oversight of the bagging of the heroin and the evidence of her trusted relationship with Carde, defendant's possession of three of Carde's vehicles with trap compartments in them is relevant to the court's consideration of the weight of evidence against her.

years, the evidence showed that defendant has an estimated monthly cash flow of $742. This amount does not take into consideration expenses defendant incurred as head of household for, among other things, food, clothing, entertainment, a car, and gas for a family of four. Seven hundred and forty-two dollars per month would not likely be sufficient to cover defendant's monthly expenses, and, therefore, defendant most likely received money from another source, which—given the evidence presented by the government—was participation in the alleged Carde drug trafficking organization. Defendant taking care of her children and working part-time for Aramark for twenty years weighs in favor of her release, but the weight of the evidence against her and the lack of employment or other legitimate source of income sufficient to cover her monthly expenses, weighs in favor of defendant's detention pending trial.

Finally, the court must consider the nature and seriousness of the danger to any person or the community that would be posed by defendant's release. In other words, the court must *predict* whether defendant will engage in drug trafficking if released pending trial. Perry, 788 F.2d at 114 ("[T]he dangerousness determination involves a prediction of the detainee's likely future behavior[,]" i.e., a prediction about "the likelihood that the defendant will, if released, commit one of the proscribed federal offenses."). "Such a prediction explores not the external world of past events but the inner territory of the detainee's intentions." Id. at 114. The court, however, can only look to the record before it, which reflects that in the past when defendant was released on bond, she continued to engage in criminal activity, i.e., defendant was on bond for the charges filed on May 23, 2013, for having a blood alcohol content of .02 or greater when she committed at least part of the instant offense. Most significantly, the evidence shows defendant is a part-time concession stand worker who bears financial responsibility for her family of four. Defendant's income from her part-time job, however, is insufficient to pay her monthly

13

expenses. Thus, even if defendant had rebutted the section 3142(e) presumption, in light of the strong evidence against her with respect to her involvement in the alleged Carde drug trafficking organization, the court is compelled to predict that defendant is likely to traffic in drugs if she is released pending trial, which is a very serious danger that would be posed to the community.[5]

After considering the record as a whole, including consideration of the nature and circumstances of the serious drug offense charged, the strong weight of the evidence against defendant, the history and characteristics of defendant, the nature and seriousness of danger to the community posed by defendant's release, and the rebuttable presumption, which retains evidentiary weight, there is no condition or set of conditions which would reasonably assure that defendant would not engage in drug trafficking while on release pending trial. The government met its burden to show by clear and convincing evidence that defendant poses a risk of danger to the community, i.e., she is likely to engage in drug trafficking if released prior to trial. The court will, therefore, enter an order of detention for defendant pending trial. An appropriate order will be entered.

Dated: December 12, 2013             /s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge

---

[5] The government argued defendant is a danger to the community as shown by her prior convictions for manslaughter and intimidation of a witness. The court, like the magistrate judge, will not give those charges substantial weight because the convictions are more than ten years old and there is no evidence of violent conduct after those offenses. The court notes, however, that it is troubling that defendant was solicited by Carde to approach a witness with respect to the pending charges against him in state court.